UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ANTHONY ROLON,<br>    Petitioner,<br><br>v.<br><br>LUIS SPENCER,<br>    Respondent. | )<br>)<br>)   Civil Action No. 04-10532-GAO<br>)<br>)<br>)<br>)<br>) |

**RESPONDENT'S MEMORANDUM IN SUPPORT OF
MOTION TO DISMISS HABEAS CORPUS PETITION**

Luis Spencer, the respondent, submits this memorandum in support of his motion to dismiss the habeas corpus petition filed by Anthony Rolon ("petitioner"). As grounds, the respondent states that the petitioner has failed to comply with this Court's order to brief the merits of his presently pending habeas corpus petition, but instead has filed his third motion to stay the case, and because, in any event, there is no merit to any of the petitioner's claims.

**ARGUMENT**

I.  THIS COURT SHOULD DISMISS THE PETITION BECAUSE THE PETITIONER HAS FAILED TO COMPLY WITH THE COURT'S ORDER TO BRIEF THE MERITS OF HIS CLAIMS.

This habeas corpus petition arises from the Supreme Judicial Court's ("SJC") affirmance of the petitioner's convictions for felony-murder, two counts of assault and battery with a dangerous weapon, home invasion, and armed burglary. *See Commonwealth v. Rolon*, 438 Mass. 808, 784 N.E.2d 1092 (2003). Since filing his three count petition on March 12, 2004, the petitioner has repeatedly sought to stay the case so that he could exhaust two new claims in state court. His first motion to stay, dated April 22, 2005, was denied on August 24, 2005 (O'Toole,

2

J.). The petitioner filed his subsequent renewed motion to stay, or in the alternative, to dismiss the case without prejudice, on September 19, 2005. In a written order dated November 1, 2005, the Court (Sorokin, M.J.) denied the renewed motion and ordered the petitioner to brief the merits of the three exhausted claims contained in his petition by December 1, 2005. Failure to do so, the Court warned, risked dismissal of the petition.

On November 30, 2005, the petitioner filed a document that he styles, "Petitioner's Brief on the Merits as to Why the Writ Should Issue." *See* Doc. No. 20  The title of this pleading, and the date of the filing, reflect the full extent to which the petitioner comported with the Court's November 1 order. Even a cursory review of the petitioner's "Brief on the Merits" demonstrates that the document is little more than a third motion for stay-and-abeyance, wholly devoid of a discussion of the merits of the claims raised in his petition. Indeed, the petitioner acknowledges that the document is to serve as an "explanation as to why the petition should be dismissed without prejudice, or, in the alternative, stayed in abeyance." Doc. No. 20, at 11. Because the petitioner has made no attempt to brief the merits of this claim, and because this is the second time he has refused to do so, *see* Doc. No. 18, at 2, the Court should dismiss the case.

II. IN THE ALTERNATIVE, THE COURT SHOULD DISMISS THE PETITION BECAUSE NONE OF THE EXHAUSTED CLAIMS HAS MERIT.

Since the petition was filed after the effective date of the Antiterrorism and Effective Death Penalty Act ("AEDPA"), this Court's review is governed by that act. *Lindh v. Murphy*, 521 U.S. 320, 336 (1997). Under the AEDPA, a state court's determination of the facts presented in the state court proceeding are presumed to be correct. *Miller-El v. Dretke*, 545 U.S. ___, 125 S. Ct. 2317, 2325 (2005). Nevertheless, a habeas corpus petitioner may rebut this

3

"'presumption of correctness by clear and convincing evidence.'" *Id.* (quoting 28 U.S.C. § 2254(e)(1)). "The standard is demanding but not insatiable . . . '[d]eference does not by definition preclude relief.'" *Id.* (quoting *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003)). In this case, the petitioner has never claimed that the facts found by the SJC were not correct. Consequently, the following facts, as determined by the SJC, are presumed correct:

> The defendant's convictions stem from an incident in which a group of armed men stormed an apartment in a New Bedford housing project in retaliation for an earlier confrontation involving some of the apartment's occupants. Three persons in the apartment -- Robert Botelho, Matthew Grant, and Anthony Mullen -- were stabbed in the course of the ensuing melee. Botelho died from his injuries. Grant and Mullen survived. The Commonwealth's theory was that Rolon was the principal instigator of the group's attack on the apartment and that he was the one who fatally stabbed Botelho during the course of the attack.
>
> On the evening of January 20, 1996, Botelho, Mullen and Grant were visiting the apartment of Botelho's girl friend, Natasha Azevedo. Azevedo lived in the apartment with her two-year old son, her sister Tiffany, and her cousin, Desiree Gibbs. After some period of drinking, the three men and three women decided to go to a party being held at a nearby apartment in the housing project. There was some concern about potential friction between Botelho and other guests who might be at the party, and the three men armed themselves: Mullen with a "steak fork," Grant with a hammer, and Botelho with a pistol. Botelho's pistol, although it appeared real, had a plug in the barrel and was incapable of firing. After leaving Azevedo's baby with a next door neighbor, the group proceeded to the party at around 11 P.M.
>
> At the party, a fight erupted between Mullen and one of the other guests. During that altercation, Botelho pulled out his gun, waved it around, and told everyone to "get off [his] boy." The defendant, Anthony Rolon, arrived shortly before the end of the fight and began arguing with Botelho. Rolon complained that Botelho would "bring the cops around" where he, Rolon, was "trying to make money." During that argument, Botelho pulled his gun out, waved it around, and repeatedly pointed it at Rolon. In response, Rolon stretched out his arms and told Botelho to "come on, go ahead." Various friends intervened, convinced Botelho to put his gun away and leave, and escorted Botelho and his companion back to Azevedo's apartment to make certain that they left. However, despite the efforts to separate Botelho from Rolon, Rolon and a few of his friends followed close behind. Rolon continued shouting at Botelho ("Come on, you're a big man, go

4

ahead"). When they reached Azevedo's apartment, words continued to be exchanged, with Rolon yelling for Botelho to come out and fight. Botelho ultimately told them to leave, and went inside Azevedo's apartment. One of Rolon's friends yelled out, "We'll be back." Rolon's group then left, and all was quiet for some ten to twenty minutes thereafter.

During that interval of time, Rolon's group joined up with a larger group of some fifteen to twenty young men. Most of them were armed, carrying knives, bats, shovels, hammers, sticks, and frying pans. As they assembled slightly down the hill from Azevedo's apartment, someone asked what they were doing. An unidentified member of the group replied, "We're [going to] take care of something." Others were heard asking who had pulled a gun on Rolon. Rolon said that he "was going to get the kid" with the gun. Various people who had been at the earlier party saw the armed group and attempted to dissuade Rolon, telling him and his companions that they should "just drop it . . . just leave it alone," that "the person's gone, he's left," and "[t]here's no more reason to fight." However, Rolon did not respond, and "nobody seemed to listen." Anticipating trouble, one partygoer went to telephone the police.

Rolon, at the head of one group, proceeded up the hill in the direction of Azevedo's apartment, while a smaller group broke off and approached the apartment by a different route. As they reached the apartment, one group went around to the back while the other remained in front. The attack began by smashing the apartment windows with a rock, a board, and a shovel. Botelho, Mullen and Grant rushed out the back door. Botelho, carrying his inoperable gun, ran at one of his attackers and struck him with the gun. However, the gun fell to the ground, and someone called out that the gun was a "fake." Grant grabbed Botelho and rushed back toward the apartment. Rolon and one of his companions, Hidekel "Kelly" Hernandez, chased after Botelho and caught up with him just outside the back door. Hernandez began hitting Botelho; Rolon stabbed him several times. Botelho went back inside the apartment, and ultimately collapsed in the living room.

Meanwhile, other members of Rolon's group were fighting with Mullen outside. Mullen was hit with a shovel and cut with a knife. When he made his way back inside the apartment, he was assaulted by yet another intruder with a knife. Others pushed their way through the back door and caught up with Grant, who had managed to get inside as far as the living room. Surrounded by attackers who had him pinned down on the couch, Grant was struck in the head with the handle of a hammer and stabbed in the buttocks and thigh, severing an artery. Versions differed as to the identity of individuals who stabbed Mullen and Grant, and versions differed as to whether Rolon himself had ever been inside the

5

apartment at any point.[1]  By all accounts, the scene was chaotic, and most of the perpetrators were never identified.

The attack ended when one of the intruders yelled out "five-o" (a reference to the imminent arrival of the police) and the group fled.  Rolon and several others regrouped at a friend's apartment shortly thereafter.  Hernandez, whose hands were bloody, reported that he had gotten "the kid inside the house good," and Rolon bragged that "he got that kid good with the gun."

Botelho was still alive when police arrived at the scene, but he succumbed shortly thereafter.  He had three deep stab wounds in the chest, the fatal wound being to the heart.  He had also sustained blunt force injuries and lacerations to the head, neck, shoulders, back, arm, thigh, and hands.

*Commonwealth v. Rolon*, 438 Mass. 808, 810-813, 784 N.E.2d 1092, 1096-1098 (2003).

In addition to the presumption of correctness afforded the state court's factual findings, "AEDPA provides that, when a habeas petitioner's claim has been adjudicated on the merits in state-court proceedings, a federal court may not grant relief unless the state court's adjudication of the claim 'resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States,' 28 U.S.C. § 2254(d)(1)[,]"  *Brown v. Payton*, 544 U.S. ___, 125 S. Ct. 1432, 1438 (2005), or

---

[1] In footnote 3 of its opinion, the SJC stated: "Natasha Azevedo had run out the front door when the attack began, where she saw 'people coming from everywhere' and one group headed around back.  She followed them to the rear of the building, and saw a group of six people at the back door going into the apartment.  She identified Rolon as one of those six, and testified that the entire group went inside.  However, she did not specifically see Rolon go through the doorway 'because there was a few people around him.'  In her subsequent statement to police at the scene (introduced as a spontaneous utterance), Azevedo identified Rolon as one of the attackers 'in' her house.  However, when Azevedo herself went inside the apartment, she did not actually see Rolon anywhere in the apartment, nor did any other witness identify Rolon as one of the many intruders inside the apartment.  At trial, Azevedo testified that she had never seen Rolon 'in' the dwelling, and that her spontaneous utterance identifying him as having been 'in' the apartment was incorrect.  Eddie Torres, the sole witness who identified Rolon as the one who had stabbed Botelho, testified that the stabbing occurred just outside, up against the back door, and that Rolon 'left' after the stabbing."

6

"resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).

"A state-court decision is contrary to [the Supreme Court's] clearly established precedents if it applied a rule that contradicts the governing law set forth in [Supreme Court] cases, or if it confronts a set of facts that is materially indistinguishable from a decision of [the Supreme Court] but reaches a different result. *Williams v. Taylor*, [529 U.S. 362 (2000)]; *Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam). A state court decision involves an unreasonable application of [the Supreme] Court's precedents if the state court applies [the] Court's precedents to the facts in an objectively unreasonable manner. *Williams v. Taylor*, [529 U.S.] at 405; *Woodsford v. Visciotti*, 537 U.S. 19, 24-25 (2002) (per curiam)." *Brown*, 125 S. Ct. at 1438-1439.

There is no bright line rule as to what constitutes an "objectively unreasonable" application of established Supreme Court precedent. *Williams*, 529 U.S. at 410. As the *Williams* decision makes clear, however, an unreasonable state-court determination is not the equivalent of an incorrect one. *Id.*

> Indeed, because Congress used the word "unreasonable" . . . , and not words like "erroneous" or "incorrect," a federal habeas court "may not issue the writ simply because the court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable.

*Hurtado v. Tucker*, 245 F.3d 7, 16 (1st Cir.) (quoting *Williams*, 529 U.S. at 411), *cert. denied*, 534 U.S. 925 (2001). *See also Kibbe v. DuBois*, 269 F.3d 26, 35 (1st Cir. 2001), *cert. denied*, 535 U.S. 960 (2002) (under AEDPA's "broad objective standard, a federal court cannot grant habeas relief simply because it disagrees with or finds error in the state court's application of

federal law").

In this case, the petitioner does not cite to any authority to support his claim that habeas corpus relief is appropriate. In any event, because, as discussed below, the SJC's decision was neither contrary to nor an unreasonable application of any federal law, granting habeas corpus relief is inappropriate and the Court should dismiss the petition.

> A. <u>There Is No Merit to The Petitioner's Claim That The Prosecutor Vouched For The Credibility of A Witness By Introducing Evidence That The Witness Was Testifying Pursuant to a Plea Agreement Or By Conceding That The Witness Had "Lied" During Portions of His Testimony</u>.

In his first assignment of error, the petitioner claims that the prosecutor violated his right to a fair trial by vouching for the testimony of a co-defendant, Eddie Torres. Habe. Pet. ¶ 12(A). The background of this claim, as described by the SJC, is that Eddie Torres was a participant "in the storming of Azevedo's apartment" and "a juvenile at the time. Pursuant to a plea agreement, he pleaded to being delinquent by reason of murder in the second degree and testified for the prosecution at Rolon's trial. . . . Torres was the only eyewitness to testify that it was Rolon who actually stabbed Botelho." *Rolon*, 438 Mass. at 813, 784 N.E.2d at 1098.

"During the direct examination of Torres, the prosecutor elicited the fact that Torres had a plea agreement. He then asked Torres whether he had agreed to provide 'complete and truthful and accurate testimony' to which Torres replied, 'Yes." In one subsequent question concerning the agreement, the prosecutor phrased the question in a fashion that made reference to the obligation to give 'complete, truthful and accurate' testimony. The defendant objected to both questions; both objections were overruled." *Rolon*, 438 Mass. at 813, 784 N.E.2d at 1098.

It is well settled that a prosecutor may neither vouch for the credibility of a witness nor

8

express a personal opinion concerning the guilt of the accused. *United States v. Young*, 470 U.S. 1, 18 (1985). Such behavior is proscribed because it may "jeopardize the defendant's right to be tried solely on the basis of the evidence presented to the jury; and the prosecutor's opinion carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence." *Id.* at 18-19 (citing *Berger v. United States*, 295 U.S. 78, 88-89 (1935)); *United States v. Bey*, 188 F.3d 1, 7 (1st Cir. 1999). Yet prosecutorial vouching is not a per se constitutional violation. Rather, "[t]he relevant question is whether the prosecutor's comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637 (1974)). Under the circumstances of this case, there was no error whatsoever.

"It is not error to inform the jury of the contents of a plea agreement, nor is it improper for the government to call attention to a witness' motivation for testifying." *United States v. Dockray*, 943 F.2d 152, 156 (1st Cir. 1991) (citations omitted). "This is true even on direct examination." *Id.* (citing *United States v. Munson*, 819 F.2d 337, 345 (1st Cir. 1987)).

As the SJC found:

> Here, [an] attack on Torres's credibility in connection with the plea agreement had been mounted in explicit terms in defense counsel's opening statement. Defense counsel told the jury that the entire case depended on the credibility of Torres, that they could not convict Rolon unless they "believe[d] everything Torres tells [them] about what happened," and that they would hear evidence of Torres's agreement with the prosecution. Defense counsel then described the terms of that plea agreement as follows: "[H]e has got to tell you that Kelly Hernandez and Anthony Rolon killed Robert Botelho. If he doesn't tell you that, he has no agreement." Thus, by the time of Torres's direct examination, the jury had already heard a significant mischaracterization of what his obligation under the agreement was, i.e., that the agreement identified specific details that Torres was

9

required to include in his testimony. *Rolon*, 438 Mass. at 814, 784 N.E.2d at 1099. Because a prosecutor may permissibly mention a plea agreement during direct examination, *Munson*, 819 F.2d at 345, and because the prosecutor may do so after an attack on the witness's credibility, *Dockray*, 943 F.2d at 156, there was no error here.

Nor would the petitioner's other two claims, that it was error for the prosecutor to refer to the fact that the plea agreement had been signed by Torres's mother and attorney, and that the prosecutor purportedly vouched for Torres during closing argument by acknowledging that Torres had "lied" about his own participation in the murder, warrant habeas relief.[2] To begin with, the references to the signatures "arose for purposes of authenticating the agreement and refreshing Torres's memory when he initially testified that he did not even recognize the agreement," and the petitioner failed to object to their admission. *Rolon*, 438 Mass. at 815, 784 N.E.2d at 1099-1100. Thus, the petitioner waived the claim for purposes of appellate review. Because the SJC adheres to the waiver rule, this Court should not grant habeas relief as the claim was decided on an independent and adequate state law ground. *Horton v. Allen*, 370 F.3d 75, 80 (1st Cir. 2004). And in any event, even if the prosecutor had introduced the signatures as substantive evidence of Torres's truthfulness, the prosecutor would not have engaged in impermissible vouching. *See United States v. Vazquez-Rivera*, 407 F.3d 476, 480 (1st Cir. 2005) ("Improper vouching occurs when prosecutors . . . place the prestige of the [government] behind witness by making personal assurances of credibility or by suggesting that facts not before the

---

[2] The petitioner raised these two claims in the SJC but does not specifically refer to them in his habeas petition. The respondent discusses the claims to the extent the petition might be broadly construed to encompass them.

10

jury support the witness's account") (internal quotations omitted).

Finally, as the SJC noted, "[a] prosecutor does not, in any sense, 'vouch' for a witness by conceding that the witness has 'lied.'" *Rolon*, 438 Mass. at 815, 784 N.E.2d at 1100. Rather, it is permissible -- and indeed, "common" -- to argue, as the prosecutor did here, that the witness "should not be believed with respect to those details that were supported by other evidence." *Id.* at 816, 784 N.E.2d at 1100. In short, "[i]t is not improper vouching for the prosecutor to point to reasons why a witness's testimony, or portions of a witness's testimony, should logically be believed." *Id.*; *see Vazquez-Rivera*, 407 F.3d at 480 (defining impermissible vouching). Habeas corpus relief is inappropriate here.

> B. The SJC Coreclty Determined That There Was "Ample" Evidence To Convict The Petitioner of Felony-Murder Where The Petitioner Did Not Contest That He Stabbed The Victim And Where There Was Evidence That The Petitioner Accompanied His Armed Companions Back To The Victim's Apartment To Storm It By Force In Retaliation For The Victim's Earlier Assault On Him.

In the state court, the petitioner "acknowledge[d] that there was evidence that he stabbed Botelho but, where he attacked Botelho outside the apartment, without ever having entered the apartment, he argue[d] that he did not himself commit armed burglary." *Rolon*, 438 Mass. at 817, 784 N.E.2d at 1101.[3] Ultimately, the case was submitted to the jury solely on a theory of joint venture. *Id.* at 817, 784 N.E.2d at 1101. Thus, the sole question is whether there was sufficient evidence to support the theory that Rolon was present at the scene of the armed burglary, with knowledge that another intended to commit the armed burglary, or with intent to commit the armed burglary, and by agreement, was willing and able to help the other if

---

[3] In footnote 9 of its opinion, the SJC stated: "Contrary to his argument, there was some evidence to support the inference that Rolon had entered the dwelling at some point during the incident."

11

necessary. *See, e.g., Commonwealth v. Feyenord*, 445 Mass. 72, 85, 833 N.E.2d 590, 602 (2005) (describing elements of joint venture theory of liability under Massachusetts law). Because a state court's interpretation of state law binds a federal court sitting in habeas corpus, *see Bradshaw v. Richey*, 126 S. Ct. 602, 604 (2005) (per curiam) (citations omitted), this Court's review is limited to "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found" that the petitioner engaged in a joint venture to commit the armed burglary. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original).

Here, "the evidence amply supported the inference that retaliation for Botelho's earlier assault on Rolon was the entire purpose of the venture; that Rolon was the one who had attempted to lure Botelho out of the apartment to engage in a retaliatory fight; and that, unsuccessful in this attempt, he had accompanied his obviously armed companions back to the apartment to storm it by force, spurning the attempts of those who were seeking to dissuade him from carrying the dispute further." *Rolon*, 438 Mass. at 818, 784 N.E.2d at 1102. Because the petitioner does not challenge these facts, let alone cite to evidence that might rebut them by clear and convincing evidence, 28 U.S.C. § 2254(e)(1), they are presumed correct. Where the facts amply supported the petitioner's conviction as a joint venturer, there is no basis to grant him habeas corpus relief on this ground.[4]

---

[4] In the state courts, the petitioner also "argue[d] that, because the fatal stabbing occurred just outside the apartment without the need for him to enter the premises, Botelho's death did not occur in connection with the predicate felony." *Rolon*, 438 Mass. at 818, 784 N.E.2d at 1102. The SJC rejected this claim, and the petitioner has declined to press it in his habeas petition, or his memorandum in support thereof. In any event, were he to press such a claim, it would not warrant habeas relief where the Supreme Court has "repeatedly held that a state court's interpretation of state law . . . binds a federal court sitting in habeas corpus." *Bradshaw v.*

12

C. This Court May Not Consider The Petitioner's Claim That The State Court Should Have Ordered A New Trial, Or In The Alternative, Reduced The Verdict From First-Degree Murder To Manslaughter Because The SJC's Decision Is Premised On An Independent And Adequate State Law Ground.

The petitioner's final claim for relief is that the SJC should have, pursuant to Mass. Gen. Laws ch. 278, § 33E, ordered a new trial, or in the alternative, reduced the verdict from first-degree murder to manslaughter. *See* Habe Pet. ¶ 12(C). Mass. Gen. Laws ch. 278, § 33E entitles a defendant in a capital case to plenary review of his conviction. *See, e.g., Commonwealth v. Cruz*, 442 Mass. 299, 312, 812 N.E.2d 1178, 1187 (2004). Pursuant to this statute, the SJC will, in addition to considering the claims raised by the defendant, "examine the appellate record to determine whether there were any errors on the part of the defendant's trial counsel, the prosecutor, or the judge, that were likely to lead to a substantial likelihood of a miscarriage of justice." *Id.* (citations omitted).

Initially designed to require the SJC to examine only those "questions of law fairly raised," section 33E was amended in 1939 to provide for plenary review. *Commonwealth v. Brown*, 376 Mass. 156, 167-168, 380 N.E.2d 113, 119-120 (1978). The impetus for this statutory amendment was "in part to remedy the defects in such procedures which had been especially evident in the celebrate cases of *Commonwealth v. Sacco*, 259 Mass. 128 (1927) and *Commonwealth v. Sacco*, 255 Mass. 369 (1926)," the infamous Sacco and Vanzetti prosecutions. *Brown*, 376 Mass. at 167-168, 380 N.E.2d at 120. In short, section 33E is a matter purely of state statutory law. As a result, the SJC's determination that relief was inappropriate under the

---

*Richey*, 126 S. Ct. 602, 604 (2005) (per curiam) (citing *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) and *Mullaney v. Wilbur*, 421 U.S. 684, 691 (1975)), and where the SJC was interpreting armed burglary under Massachusetts law.

13

circumstances of the petitioner's case is not cognizable in this federal habeas proceeding. 28 U.S.C. § 2254(a); *Illinois v. Rodriguez*, 497 U.S. 177, 182 (1990) ("When a state-court decision is clearly based on state law that is both adequate and independent, we will not review the decision.") (citing *Michigan v. Long*, 463 U.S. 1032, 1041 (1983)).  Consequently, this Court must deny this claim for relief as well.

        Respectfully submitted,

        THOMAS F. REILLY
        ATTORNEY GENERAL

        /s/ Daniel I. Smulow
        Daniel I. Smulow, BBO 641668
        Assistant Attorney General
        Criminal Bureau
        One Ashburton Place
        Boston, Massachusetts 02108
        (617) 727-2200 ext. 2949

Dated: December 30, 2005

### Certificate of Service

    I, Daniel I. Smulow, hereby certify that on December 30, 2005, I served a true copy of this document by first class mail to the petitioner: Anthony Rolon, M.C.I. - Norfolk, P.O. Box 43 Norfolk, MA 02056-0043.

        /s/ Daniel I. Smulow
        Daniel I. Smulow