UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ANTHONY ROLON )<br>    Petitioner, )<br>    )<br>v. )<br>    )<br>LUIS SPENCER, )<br>    Respondent )<br>    ) | Civil Action No. 04-10532- GAO |

REPORT AND RECOMMENDATION ON RESPONDENT'S MOTION TO DISMISS
PETITIONER'S PETITION FOR WRIT OF HABEAS CORPUS

September 13, 2006

SOROKIN, M. J.

The Report and Recommendation issued on September 12, 2006 failed to notify Petitioner of his right to object. This Report includes that notice. In all other respects it is identical to the first Report.

On March 12, 2004, Anthony L. Rolon, acting *pro se*, petitioned for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, as amended by the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA). (Petition for Writ of Habeas Corpus ("Petition"), Docket # 2). Now before the Court is Respondent's Motion to Dismiss the Petition (Docket # 22). For the following reasons, I recommend that the Court ALLOW Respondent's Motion.

   A.  Factual Background

   The following facts are drawn from the Supreme Judicial Court's (SJC) decision in Commonwealth v. Rolon, 438 Mass. 808, 810- 813 (2003), and are "presumed to be correct." 28

1

U.S.C. § 2254 (e)(1)("a determination of a factual issue made by a state court shall be presumed to be correct."); see Lindh v. Murphy, 521 U.S. 320, 336 (1997)(AEDPA governs habeas petitions filed after April 24, 1996).

> On the evening of January 20, 1996, [the victims Robert] Botelho, [Anthony] Mullen and [Matthew] Grant were visiting the apartment of Botelho's girl friend, Natasha Azevedo. Azevedo lived in the apartment with her two-year old son, her sister Tiffany, and her cousin, Desiree Gibbs. After some period of drinking, the three men and three women decided to go to a party being held at a nearby apartment in the housing project. There was some concern about potential friction between Botelho and other guests who might be at the party, and the three men therefore armed themselves: Mullen with a "steak fork," Grant with a hammer, and Botelho with a pistol. Botelho's pistol, although it appeared real, had a plug in the barrel and was incapable of firing. After leaving Azevedo's baby with a next door neighbor, the group proceeded to the party at around 11 p.m.

> At the party, a fight erupted between Mullen and one of the other guests. During that altercation, Botelho pulled out his gun, waved it around, and told everyone to "get off [his] boy." The defendant, Anthony Rolon, arrived shortly before the end of the fight and began arguing with Botelho. Rolon complained that Botelho would "bring the cops around" where he, Rolon, was "trying to make money." During that argument, Botelho pulled his gun out, waved it around, and repeatedly pointed it at Rolon. In response, Rolon stretched out his arms and told Botelho to "come on, go ahead." Various friends intervened, convinced Botelho to put the gun away and leave, and escorted Botelho and his companions back to Azevedo's apartment to make certain that they left. However, despite the efforts to separate Botelho from Rolon, Rolon and a few of his friends followed close behind. Rolon continued shouting at Botelho ("Come on, you're a big man, go ahead"). When they reached Azevedo's apartment, words continued to be exchanged, with Rolon yelling for Botelho to come out and fight. Botelho ultimately told them to leave, and went inside Azevedo's apartment. One of Rolon's friends yelled out, "We'll be back." Rolon's group then left, and all was quiet for some ten to twenty minutes thereafter.

> During that interval of time, Rolon's group joined up with a larger group of some fifteen to twenty young men. Most of them were armed, carrying knives, bats, shovels, hammers, sticks, and frying pans. As they assembled slightly down the hill from Azevedo's apartment, someone asked what they were doing. An unidentified member of the group replied, "We're [going to] take care of something." Others were heard asking who had pulled a gun on Rolon. Rolon said that he "was going to get the kid" with the gun. Various people who had been at the earlier party saw the armed group and attempted to dissuade Rolon, telling him and his companions that they should "just drop it … just leave

it alone," that "the person's gone, he's left," and "[t]here's no more reason to fight." However, Rolon did not respond, and "nobody seemed to listen." Anticipating trouble, one partygoer went to telephone the police.

Rolon, at the head of one group, proceeded up the hill in the direction of Azevedo's apartment, while a smaller group broke off and approached the apartment by a different route. As they reached the apartment, one group went around to the back while the other remained in front. The attack began by smashing the apartment windows with a rock, a board, and a shovel. Botelho, Mullen, and Grant rushed out the back door. Botelho, carrying his inoperable gun, ran at one of his attackers and struck him with the gun. However, the gun fell to the ground, and someone called out that the gun was a "fake." Grant grabbed Botelho and rushed back toward the apartment. Rolon and one of his companions, Hidekel "Kelly" Hernandez, chased after Botelho and caught up with him just outside the back door. Hernandez began hitting Botelho; Rolon stabbed him several times. Botelho went back inside the apartment, and ultimately collapsed in the living room.

Meanwhile, other members of Rolon's group were fighting with Mullen outside. Mullen was hit with a shovel and cut with a knife. When he made his way back inside the apartment, he was assaulted by yet another intruder with a knife. Others pushed their way through the back door and caught up with Grant, who had managed to get inside as far as the living room. Surrounded by attackers who had him pinned down on the couch, Grant was struck in the head with the handle of a hammer and stabbed in the buttocks and thigh, severing an artery. Versions differed as to the identity of the individuals who stabbed Mullen and Grant, and versions differed as to whether Rolon himself had ever been inside the apartment at any point.[1] By all accounts, the scene was chaotic, and most of the perpetrators were never identified.

---

[1] "Natasha Azevedo had run out the front door when the attack began, where she saw "people coming from everywhere" and one group headed around back. She followed them to the rear of the building, and saw a group of six people at the back door going into the apartment. She identified Rolon as one of those six, and testified that the entire group went inside. However, she did not specifically see Rolon go through the doorway "because there was a few people around him." In her subsequent statement to police at the scene (introduced as a spontaneous utterance), Azevedo identified Rolon as one of the attackers "in" her house. However, when Azevedo herself went inside the apartment, she did not actually see Rolon anywhere in the apartment, nor did any other witness identify Rolon as one of the many intruders inside the apartment. At trial, Azevedo testified that she had never seen Rolon "in" the dwelling, and that her spontaneous utterance identifying him as having been "in" the apartment was incorrect. Eddie Torres, the sole witness who identified Rolon as the one who had stabbed Botelho, testified that the stabbing occurred just outside, up against the back door, and that Rolon "left" after the stabbing." Id. at 811, fn. 3.

The attack ended when one of the intruders yelled out "five-o" (a reference to the imminent arrival of the police) and the group fled. Rolon and several others regrouped at a friend's apartment shortly thereafter. Hernandez, whose hands were bloody, reported that he had gotten "the kid inside the house good," and Rolon bragged that "he got that kid good with the gun."

Botelho was still alive when police arrived at the scene, but he succumbed shortly thereafter. He had three deep stab wounds in the chest, the fatal wound being to the heart. He had also sustained blunt force injuries and lacerations to the head, neck, shoulders, back, arm, thigh, and hands.

B. Procedural History

Rolon was convicted of murder in the first degree with a predicate of armed burglary; two counts of assault and battery by means of a dangerous weapon; armed assault in a dwelling; home invasion; and armed burglary. Rolon, 438 Mass. 809. Following his convictions, Rolon filed a motion to reduce the verdict pursuant to Mass. R. Crim. P. 25 (b)(2). The trial court judge allowed that Motion and reduced Rolon's conviction to murder in the second degree. Id.

The Commonwealth appealed the reduction to the SJC. Rolon similarly appealed, asking for a new trial or a further reduction of the verdict to manslaughter. Rolon argued that: (1) his right to a fair trial was violated when the prosecutor improperly vouched for a key prosecution witness; (2) his Motion for a Required Finding of Not-Guilty at trial was denied in error because there was insufficient evidence that he had committed the predicate felony; and (3) he was entitled to a further reduction of the felony-murder verdict under M.G.L c. 278 § 33E.

On March 13, 2003, the SJC: " affirm[ed] the conviction of murder in the first degree, reverse[d] the order reducing the degree of guilt, reverse[d] the convictions of assault and battery by means of a dangerous weapon and armed assault in a dwelling, vacate[d] as duplicative the

conviction of armed burglary and decline[d] to grant relief pursuant to G.L.c. 278 § 33E. Id. at 809- 10.

On March 12, 2004, Rolon filed his petition for a writ of habeas corpus with this Court, alleging the same grounds that he had raised before the SJC. Subsequently, however, Rolon filed a Motion to Stay that Petition so that he could exhaust two additional state claims. (Docket # 11, dated April 22, 2005).[2]

On August 24, 2005, Judge O'Toole denied the Motion to Stay (Order, O'Toole, J.) and referred the case to the undersigned. (Docket # 15). On September 19, 2005, Rolon renewed his Motion to Stay, further requesting "in the alternative, dismissal without prejudice to exhaust State remedies." (Petitioner's Renewed Motion to Stay, Docket # 16, at pg. 1).

On November 1, 2005, I denied Rolon's renewed Motion to Stay and further ordered Rolon to brief the merits of his exhausted claims. (Sorokin, M.J., Memorandum and Order, Docket # 18). On November 30, 2005, Rolon submitted a document entitled "Petitioner's Brief on the Merits As to Why the Writ Should Issue." (Docket # 20). On December 30, 2005, Respondent filed a Motion to Dismiss the Petition (Docket # 21), which Motion is now before the Court.

C.     Discussion

1. Motion for Dismissal For Failure to Comply with the Court's Order

Respondent argues that Mr. Rolon "failed to comply with the Court's Order to brief the merits" of the already-filed Petition, and urges the Court to dismiss the Petition on this technical

---

[2] In general parlance, Rolon's additional claims are for ineffective assistance of counsel and violation of the prohibition against double jeopardy. (Affidavit in Support of Petitioner's Motion to Stay, Docket # 12).

ground.  (Memorandum in Support of Respondent's Motion to Dismiss ("Respondent Mem.") Docket # 22 at pg. 1).  As the merits of the Petition are ripe for review, and as Rolon refers to the merits of his exhausted claims in his brief, I recommend that the Court reject Respondent's Motion to Dismiss as to this argument.

        2. Motion to Dismiss on the Merits

Rolon raises three grounds for habeas relief: (1) that his right to a fair trial was comprised by the prosecutor's improper vouching for the credibility of "a key prosecution witness;" (2) that Rolon was entitled to a not-guilty verdict because there was "insufficient evidence as a matter of law" that Rolon was a "participant in a joint enterprise," to commit an armed burglary; and finally, (3) that, pursuant to "its power under M.G.L. c. 278 § 33E," the SJC should have ordered a new trial or reduced the murder verdict to manslaughter because "[a]ll of the credible evidence" had Mr. Rolon stabbing the victim outside the apartment so that "the causal connection between [Rolon's] alleged joint venture participation in the underlying felony [armed burglary] and the stabbing death of the victim, was weak." (Petition at pgs. 7-8).

Under AEDPA, a federal court may grant a habeas petition "with respect to any claim that was adjudicated on the merits in State court proceedings" only if the state court decision: 1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or 2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." DiBendetto v. Hall, 272 F.3d 1, 6 (1st Cir.2001)(quoting 28 U.S.C. § 2254(d)).  A state court's decision is "contrary to [the Supreme] Court's established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and

nevertheless arrives at a result different from our precedent." Williams v. Taylor, 529 U.S. 362, 406 (2000)(O'Connor, J., concurring).

*a. Prosecutorial Vouching for Credibility of Prosecution Witness.*

Rolon claims that his trial was unfairly prejudiced by the prosecution's improper "vouching" for the credibility of a key prosecution witness, Eddie Torres. As the SJC did not address any federal constitutional concerns when resolving this claim against Rolon, this Court must apply de novo review. DiBendetto, 272 F.3d at 7.

Vouching is proscribed because it "can convey the impression that evidence not presented to the jury, but known to the prosecutor, supports the charges against the defendant and can thus jeopardize the defendant's right to be tried solely on the basis of the evidence presented to the jury; and the prosecutor's opinion carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence." United States v. Young, 470 U.S. 1,18 (1985). Thus, "a prosecutor may not place the prestige of the government behind a witness by making personal assurances about the witness' credibility;' nor may the prosecutor indicate that facts outside the jury's cognizance support the testimony of the government's witnesses." United States v. Bey, 188 F.3d 1, 7 (1999)(quoting United States v. Neal, 36 F.3d 1190, 1207 (1st Cir.1994)). The Government, however, "properly may admit a witness's plea agreement into evidence, discuss the details of the plea . . . and comment upon a witness's incentive to testify truthfully." Id. The test for whether a prosecutor's comments are improper is if the comments "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974).

Torres, Rolon's co-defendant, testified pursuant to a plea agreement and was the "only eyewitness to testify that it was Rolon who actually stabbed Boeltho." Rolon, 428 Mass. at 813. Rolon alleges three instances of prosecutorial "improper vouching." First, during direct examination, the government "elicited the fact that Torres had a plea agreement" and then asked Torres if he "had agreed to provide 'complete and truthful and accurate testimony,' to which Torres replied 'Yes.'" Rolon, 428 Mass. at 813. A later question by the prosecutor also referenced the need for "complete, truthful and accurate" testimony; defense counsel objected to both questions, which objections were overruled. Id.

This was not improper vouching by the prosecution. While under Massachusetts law, questions relating to a plea agreement's requirements for truthful testimony are "ordinarily . . . reserved for redirect examination after cross examination has attacked the witness' credibility based on the agreement," there is no "absolute prohibition" against referencing the agreement during direct examination, Rolon, 428 Mass. at 813, and, in any event, federal law authorizes it. United States v. Dockray, 943 F.2d 152, 156 (1st Cir.1991)(holding "[i]t is not error to inform the jury of the contents of a plea agreement, nor is improper for the government to call attention to a witness' motivation for testifying").

Next, Rolon complains that the prosecutor's direct examination of Torres improperly elicited testimony that Torres' mother and attorney signed Torres' plea agreement. Rolon's counsel did not object to the testimony regarding the signatures at trial, however, and "the SJC consistently enforces the rule that unreserved claims are forfeited, and enforced the rule in the instant case." Horton v. Allen, 370 F.3d 75, 81 (1st Cir.2004) (citations omitted).

8

> Generally, habeas review is precluded where a state court reaches its decision on an independent and adequate state law ground. A state court's decision to find a forfeiture, based upon the defendant's failure to object at trial, is an independent and adequate state law ground so long as the state court consistently applies its contemporaneous objection rule and has not waived it in the particular case by basing the decision on some other ground.

Id. at 80-81. Thus, Rolon waived this claim for habeas review, which claim was decided by the SJC under the "independent and adequate state law ground" of the "contemporaneous objection rule." Id. Moreover, as the SJC noted, the testimony about the signatures was given in the context of authenticating the plea agreement rather than for any substantive purpose such as attesting to the witness' credibility. Rolon, 438 Mass. at 815.

Finally, Rolon argues that the prosecutor's closing statement impermissibly vouched for Torres by acknowledging that Torres had lied in the portion of his testimony about his own participation in the incident, thereby implicitly vouching for the remainder of Torres' testimony.[3] The prosecutor stated that Torres was a "horrible witness," and that his testimony, when contradicted by other evidence, should not be believed; but, that where his testimony was supported by other evidence, it should be believed. Rolon, 438 Mass. at 816. Acknowledging a witness' lies is not, in any sense, vouching for that witness; indeed, as the SJC noted, such acknowledgment is a "permissible- indeed a common- approach to the problem of a witness who has been shown to be less than truthful on certain aspects of his or her testimony: admit the

---

[3] "Torres denied that he had carried any weapon and denied that he had stabbed Grant, claiming that he had been pulled away by Tiffany Azevedo when he tried to 'hit' Grant. However, eyewitnesses saw Torres on top of Grant on the couch, saw a knife in his hand, and that same hand was bloody." Rolon, 438 Mass. at 816, n16.

dishonesty . . . that has been demonstrated by more reliable evidence, and point to the existence of evidence to corroborates other portions." Id.

### b. Evidence Regarding Rolon's Participation in A Joint Venture.

Rolon next complains that there was not enough evidence, as a matter of law, to prove that Rolon was a "participant in a joint enterprise to commit an armed burglary," the predicate felony for his felony murder conviction. (Petition at pg. 7). "In reviewing a sufficiency-of-the evidence-claim, the Court must view the evidence in the light most favorable to the Government, deferring to the jury's verdict if the evidence can support varying interpretations, at least one of which is consistent with the defendant's guilt." U.S v. Neal, 36 F.3d 1190, 1203 (1st Cir.1994). "Viewed in this light, the evidence must be of such a quantum that a reasonable trier of fact *could* find guilt beyond a reasonable doubt but the evidence need not compel such a finding." Id. (emphasis original).

In reviewing the state court conviction, this Court is bound by the SJC's interpretation of Massachusetts' law, as "a state court's interpretation of state law . . . binds a federal court sitting in habeas corpus review." Bradshaw v. Richey, 126 S.Ct. 602, 604 (2005). To succeed on its joint venture theory, the Commonwealth had to prove that Rolon "was '(1) was present at the scene of the crime, (2) with knowledge that another intends to commit the crime or with intent to commit a crime, and (3) by agreement is willing and available to help the other if necessary.'" Commonwealth v. Charros, 443 Mass. 752, 758-59 (2005)(citations omitted).

Here, "there was sufficient evidence from which the jury could have concluded that" Rolon was a joint venturer in an enterprise to commit armed burglary. Dockray, 943 F.2d at 157

10

(1st Cir.1991). Rolon was present at the scene of the armed burglary, i.e. Acevedo's apartment; in fact, the evidence showed that Rolon was "at the head of" one of the groups that split up to surround the apartment, Rolon, 438 Mass. at 811, and that he was "the principle instigator" of the armed group's attack due to an earlier altercation between Rolon and the victim. Id. at 810. There was also evidence that Rolon tried to lure Botelho out of the apartment for a retaliatory fight; and, that Rolon "accompanied his obviously armed companions back to the apartment" with the clear *intent* to "storm it by force." Rolon, 438 Mass. at 818 (emphasis added). The prosecution also presented evidence of Rolon's "willing[ness] and availab[ility] to help" the group commit armed burglary. Charros, 443 Mass. at 759. Indeed, the facts as recited by the SJC and uncontested by Rolon, showed that Rolon was armed and, together with another man, "chased after Botelho and caught up with him just outside the back door of the apartment," whereupon the other man "began hitting Botelho" and Rolon "stabbed [Botelho] several times." Rolon, 438 Mass. at 811. Here, the evidence is plainly "of such a quantum that a reasonable trier of fact *could* find [Rolon] guilt[y] beyond a reasonable doubt." Neal, 36 F.3d at 1203.

     *c. Rolon's Claim that He Was Entitled to a Reduced Verdict.*

  Finally, Rolon contends that the SJC should have "exercised its power under M.G.L. c. 278 § 33E" to "order[] a new trial or reduc[e] the murder verdict to manslaughter." (Petition at pg. 7). It is black-letter law that, "when a state court decision is clearly based on state law that is both adequate and independent," federal courts "will not review the decision." Illinois v. Rodriguez, 497 U.S. 177, 182 (1990); see Lee v. Kenna, 534 U.S. 362, 375 (2002)(discussing development of "independent and adequate state ground" doctrine); Coleman v. Thompson, 501 U.S. 722, 729 (1990)(noting Supreme Court has no power to "review a state law determination

that is sufficient to support the judgment"). M.G.L. c. 278 § 33E states that, in a capital case,[4] the SJC "may, if satisfied that the verdict was against the law or the weight of the evidence, . . . or for any other reason that justice may require, (a) order a new trial or (b) direct the entry of a verdict of a lesser degree of guilt." This power is patently a matter of state statutory law; as such, the SJC's declination of the option to reduce Rolon's sentence or order a new trial, is not subject to federal court review.

## CONCLUSION

For the foregoing reasons, I recommend that the court ALLOW Respondent's Motion to

---

[4] "Capital case" is defined by the statute as "a case in which a defendant was tried on an indictment for murder in the first degree and convicted of" that charge. Id.

Dismiss (Docket # 21).[5]

/s/ Leo T. Sorokin
United States Magistrate Judge

---

[5] The parties are hereby advised that under the provisions of Fed. R. Civ. P. 72, any party who objects to these proposed findings and recommendations must file specific written objections thereto with the Clerk of this Court within 10 days of the party's receipt of this Report and Recommendation. The written objections must specifically identify the portion of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with Rule 72(b) will preclude further appellate review of the District Court's order based on this Report and Recommendation. See Keating v. Secretary of Health and Human Services, 848 F.2d 271 (1st Cir.1988); United States v. Emiliano Valencia-Copete, 792 F.2d 4 (1st Cir.1986); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603 (1st Cir.1980); United States v. Vega, 678 F.2d 376, 378-379 (1st Cir.1982); Scott v. Schweiker, 702 F.2d 13, 14 (1st Cir.1983); see also, Thomas v. Arn, 474 U.S. 140, 106 S.Ct. 466 (1985).